FILED

JUN 29 1998

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

By _____ Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
)
Plaintiff, )        Case No. A97-0068 CR (JKS)
)
vs. )
)        **MEMORANDUM OF SENTENCING**
CYRUS D.A. BRASWELL, )        **HEARING AND REPORT OF**
)        **STATEMENT OF REASONS**
Defendant. )
_____ )

**Charges:**

Counts I-IV. 21 U.S.C. § 841(a)(1), Distribution of Controlled Substance (cocaine base or crack cocaine).

Count V. 21 U.S.C. § 841(a)(1), Possession with Intent to Distribute a Controlled Substance (crack cocaine).

Count VI-VII. 21 U.S.C. § 856(a)(1), Maintaining a Place for Drug Trafficking (two counts; same residence; crack cocaine and marijuana).

Count IX. 18 U.S.C. § 1957, Money laundering.

Counsel and the defendant, Cyrus D.A. Braswell ("Braswell"), were present for a sentencing hearing on June 5, 1998. The matters set forth were reviewed and considered. The reasons for sentence, 18 U.S.C. § 3553(c), as set forth herein, were stated in open court.

A97-0068--CR (JKS)
-----------------
M. WALKER, JR.
J. BERNITZ
W. CUMMINGS

M. ROSENBAUM (US-ATTNY)
US MARSHAL
US PROBATION
MAGISTRATE JUDGE BRANSON
Carmen [USA]

Finance
C. Braswell [w/cnsl cpy]
6/30/98 redistributed w/corrected page 5.

AO 72A
(Rev.8/82)

1.    Was the presentence investigation report ("PSI") reviewed by counsel and defendant?

Yes _X_[1]            No

2.    (a)    Was information withheld pursuant to Fed. R. Cr. P. 32(c)(3)(A)?

Yes        No _X_

2.    (b)    If yes, has summary been provided by the court pursuant to Fed. R. Cr. P. 32(c)(3)(A)?

Yes        No    Not Applicable _X_

3.    Were all factual statements contained in the PSI adopted without objection?

Yes        No _X_

The PSI was adopted in part with the exception of the following disputed factual issues which have been resolved as follows after:  [ X ] evidentiary hearing, [ X ] further submissions, [ X ] arguments.[2]

**(A)** Braswell objects to ¶¶ 9-18 setting out the offense conduct.  He argues that the information in these paragraphs reflects the testimony and information provided by J.M., the confidential informant. Braswell argues that he testified at trial and contradicted all of J.M.'s testimony and proved that she was unworthy of belief.

---

[1]  At sentencing Braswell was represented by William S. Cummings, Esq., Braswell's fourth court-appointed attorney.  Braswell has adopted a strategy of attempting to obstruct justice by unilaterally and without just cause refusing to cooperate with counsel in an effort to force frequent substitutions of counsel and obstruct the proceedings. This Court has rejected Braswell's recent efforts to force substitution of counsel and has observed Braswell in court selectively cooperating with assigned counsel. The Court finds that Mr. Cummings has made all reasonable efforts to advise and inform Braswell, and if Braswell has not fully benefited from assignment of counsel he has knowingly, intelligently and voluntarily assumed the risk and estopped himself from future complaints.

[2]  References in this Memorandum by paragraph (¶) refer to the PSI.

A jury listened to the testimony of Braswell and J.M. Their testimony was in direct conflict; Braswell is correct that both could not have been telling the truth. One had to be lying regarding matters material to the case. J.M. was thoroughly cross-examined, and the jury was given uncontradicted and unimpeached evidence regarding her background from which it could evaluate her character and credibility. The jury was also instructed to view J.M.'s testimony with caution and treat Braswell's testimony like that of any other witness.[3] The jury listened to both, evaluated the corroborating evidence regarding J.M.'s testimony, and concluded that J.M. was telling the truth and Braswell was not. The Court agrees with this conclusion. The Court finds that the statement of offense conduct in the presentence report is accurate.

**(B)** Braswell objects to ¶¶ 20, 30, and 36 wherein the probation officer opines that Braswell committed perjury at trial. The Court heard the testimony of J.M. and Braswell at trial. The jury had to find that Braswell's testimony was untrue, beyond reasonable doubt, to convict him. This Court agrees that Braswell's testimony was untrue beyond any reasonable doubt. This Court has carefully considered the circumstances and concludes that Braswell was not suffering from confusion, mistake, or faulty memory. The testimony Braswell gave was knowingly and intentionally false and was given

---

[3] The Jury Instructions appear at Docket No. 89. Instruction No. 19, page 2, tells the jury to treat the testimony of Braswell like the testimony of any other witness. Instruction Nos. 23 and 24 refer to the testimony of J.M. and suggest that the jury should view her testimony with caution. The jury was also told they could consider that J.M. and Braswell had both been convicted of felonies in evaluating their testimony. *See* Instruction Nos. 22 and 23. The Court applied the balancing test set out in FED. R. EVID. 609(a)(1) before permitting Braswell to be impeached with his prior conviction. *See United States v. Alexander*, 48 F.3d 1477, 1487-89 (9th Cir.), *cert. denied*, 516 U.S. 878 (1995). It is also important to note that the Court included in Instruction No. 2 a defense theory of the case instruction that set out Braswell's theory that J.M. persuaded him to pretend to sell her drugs to fool her customers, and his attempts to pretend explained his incriminating statements on the tape recordings by the police of the sales transactions charged in Counts I to IV. The jury had to reject this theory in order to convict.

with the specific intent to mislead the jury and win an undeserved acquittal. The Court rejects Braswell's challenge to these paragraphs and adopts the probation officer's factual statement.

(C) Braswell objects to ¶¶ 25a and 25b, arguing that his offense level should be based only upon the drugs he sold and those found in his possession at the time of the search of his home. These amounts are reflected in a graph at ¶ 25. Three thousand one hundred and forty-three kilograms of marijuana would place Braswell in offense level 34. *See* USSG § 2D1.1(c). Converting the cash in the manner recommended by the probation officer and the slightly different manner recommended by the government places Braswell in the highest offense level for drugs: offense level 38. In Braswell's view, none of the money he expended in the months preceding his arrest and none of the money that passed through his bank account should be converted into contraband for purposes of enhancing his offense level. The Court finds that the drugs sold by Braswell to J.M. and seized pursuant to a search warrant do not adequately reflect the scale of the offense. *See* USSG § 2D1.1, comment. (n.12). To adequately reflect the offense, it is necessary to convert a significant amount of the income Braswell controlled between the years 1994 to 1997 to crack cocaine. This must be done to properly describe his operation and fairly approximate the quantity of crack cocaine which Braswell was dealing. *See id.*

The jury found Braswell guilty of the charge in Count IX of the indictment, concluding that he used the proceeds of drug transactions in specified real estate transactions. *See* Docket No. 89, Instruction No. 10; *see also United States v. Tokars*, 95 F.3d 1520, 1541-42 (11th Cir. 1996) (discussing significance of money laundering conviction in converting drug money to cocaine), *cert. denied*, 117 S. Ct. 1328 (1997). These transactions covered the period September 1996 to January 1997. *See* ¶ 18. To do this, the jury had to reject Braswell's theory of the case set out in Instruction No. 2 that those

funds were derived from legitimate transactions from Braswell's art businesses: Art World and Nicole's Art. The jury heard substantial evidence regarding these businesses, and Braswell's admittedly poor record keeping. Based upon that evidence, this Court agrees with the jury's conclusions and in addition concludes by a preponderance of the evidence: (1) That the art business was a front for drug trafficking and never produced significant income over and above expenses, *i.e.*, that any "net income" Braswell had was the product of drug dealing. The Court further finds, based in part on its review of the transcript of a trial of Braswell's in state court in October 1994, that Braswell has been engaged in a continuous drug operation masked by his art business since at least July of 1994, which was sufficiently united by "similarity, regularity and temporal proximity" to be considered a common scheme or plan during the time he was not imprisoned. In other words, Braswell was continuously and exclusively in the business of dealing drugs during this period of time and had no significant sources of legal income.[4] *See* ¶ 58 & Docket No. 124 (state court record of the prior state proceedings filed by the United States Attorney). (2) That Braswell had a substantial income from drug sales, part of which he deposited in his bank account in order to engage in real estate transactions and purchase assets, and part of which he simply consumed through cash purchases without depositing it in his bank account. *See* ¶ 14 (describing how Braswell paid off the loan on a truck by paying $11,544 in cash). (3) That Braswell was selling or possessing for sale crack cocaine during all of this time. *See* ¶ 58 (detailing the search of a residence which a preponderance of the evidence indicates was under Braswell's control and being used by him in connection with trafficking in crack cocaine in July of 1994; crack cocaine was found that was being prepared for sale in that search; drug paraphernalia found in that search established a drug distribution

---

[4] *See United States v. Hahn*, 960 F.2d 903, 910-11 (9th Cir. 1992).

Memorandum of Sentencing/Statement of Reasons
Page 5
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

operation and was similar in kind to paraphernalia found in the search of Braswell's current residence in conjunction with the current charges). (4) That during the period charged in the indictment Braswell spent over $70,000 in discretionary funds to acquire assets (*see* ¶ 25b), and during the period from August of 1996 to June of 1997, Braswell deposited $118,522.00 in cash and an additional amount in checks in his bank account for a total of $125,726.65. *See* government's trial exhibit No. 30. (5) That Braswell was a sole proprietor who may have employed others but who was personally and solely responsible for the entire drug operation in which he was involved. The drug proceeds were his alone. (6) That Braswell filed no income tax records which would have provided some contemporaneous support for a finding of legal income.[5] Finally, (7) that the figures establishing a value for crack cocaine at $1,100 per ounce and $600 per ½ ounce appear well established in the evidence.

In sum, the large amounts of money involved are appropriately attributed it to drug dealing. In *United States v. Jackson*, 3 F.3d 506 (1st Cir. 1993), the court stated that "[w]hen drug traffickers possess large amounts of cash in ready proximity to their drug supply, a reasonable inference may be drawn that the money represents drug profits." *Id.* at 511. There, the First Circuit affirmed the sentencing court's decision to convert to cocaine $3,966.00 found in a box next to the defendant's drugs. *See id.* at 510-12. Where a convicted drug dealer and money launderer has large amounts of money passing through his bank account and no visible means of legal support, an equally reasonable inference can be drawn that the proceeds of the bank account were derived from drug trafficking.

---

[5] Of course, Braswell is not on trial for income tax evasion. The issue is the absence of any records which would substantiate legal income, not Braswell's failure to pay taxes.

Memorandum of Sentencing/Statement of Reasons
Page 6
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

There is, however, a further question.  Even if we assume that Braswell had no net income above

his expenses from legitimate activity and that all of his net income was derived from drug sales, the

question remains:  which drugs generated the income?[6]  The jury found that Braswell had engaged in

four separate sales of crack cocaine to J.M.  In addition, it found in separate counts (Counts VI and VII)

that Braswell maintained his residence for at least two purposes: distributing crack cocaine, and growing

and presumably selling marijuana.  Search of the residence uncovered crack cocaine, powder cocaine

and a marijuana growing operation.  It seems clear based on Braswell's modus operandi and the

testimony from the 1994 search that Braswell "cooked" his own powder cocaine to make crack.  It also

appears that Braswell's operation in 1994 did not differ in any respect from his operation in 1997.

During the entire period Braswell operated using Nicole's Art and Art World as fronts.  *See* ¶ 13.  During

the entire period of his parole, Braswell refused to provide any information to his parole officer regarding

his employment and concealed the places where he was living.  It is instructive that Braswell could afford

to travel to the Dominican Republic and spend a period of time there in 1996 with no legal means of

support.  It appears that Braswell's income from drug sales for the two-year period July 1994 to August

22, 1996, was probably comparable to his income during the almost one-year period between August

22, 1996, and June 9, 1997.  When we take into account the period Braswell was out of the country

during the summer of 1996 and had others operating Nicole's Art for him, a slight downward adjustment

in estimating his income for 1994 to 1995 might be appropriate.  Assuming Braswell started commercial

dealing in 1993 and continued to build his business during 1994 and 1995, we may infer that his income

---

[6]  The question is important because the guidelines sharply distinguish between various types of
contraband in determining offense level.  If the bulk of Braswell's illegal income came from the sale of
marijuana, his resulting offense level would be less.

in those years was less than the $125,000 he accumulated in 1996 and 1997. It would be unreasonable to infer that Braswell was commercially dealing drugs in 1994 but had no drug net income in 1994 and 1995 and jumped to over $100,000 during the next two years. A gradual increase is much more likely. Finally, since Braswell was willfully false in his trial testimony, we may distrust his testimony in other particulars.

The only record evidence that Braswell had any legitimate income are: (1) $7,970 invoiced by Braswell himself, which amounts to less than the rent he was paying ($10,000 for Art World alone; *see* ¶ 25a; *see also* ¶ 18 (indicating how little income the art business generated)); and (2) $1,250 rent from two properties arguably purchased with drug proceeds. Weighing all of the evidence and drawing reasonable inferences from that evidence, Braswell most probably had a net income from drug sales conservatively estimated at significantly more than $140,000 during the period July 1994 to June 1997. Conservatively allowing one-half of that amount ($70,000, corresponding to Braswell's proven out of pocket expenditures of discretionary income) for conversion to crack cocaine is reasonable.[7] If the

---

[7] This Court is, in essence, inflating Braswell's drug-related income during his last year of operation from $125,000 by $15,000 to reflect income that the Court infers circumstantially from the entire record he earned during the preceding two years based upon the drug distribution operation uncovered in the July 1994 search and comparing it with the operation as it existed at the time Braswell committed the offenses of conviction. Braswell probably earned substantially more than $140,000 during the period in question--1994 to 1997--but the smaller figure is used to be fair to Braswell.

One other point needs to be addressed. At trial Braswell appeared to argue that the $125,000 traced to his bank account during a one-year period did not reflect separate items of income and therefore cannot be used to estimate his income from drug dealing. Rather, Braswell contended he had withdrawn money in order to put up earnest money on various properties he was considering purchasing and when those transactions fell through he redeposited the same money in his account. Consequently, Braswell argues assessing him with the whole $125,000 amounts to double counting. The record does not bear out this argument. *See* ¶ 18 (suggesting that the money Braswell deposited with City Mortgage in connection with his attempted purchase of the Thunderbird Place property was transferred directly

(continued...)

conservative estimate of over $140,000 is correct, then that would leave $70,000 plus as income from the sale of marijuana and powder cocaine. The Court will therefore (1) adopt[8] the analysis in ¶¶ 25a and 25b as a minimum amount established by the preponderance of the circumstantial evidence; (2) convert the $70,000 to ounces of crack cocaine by dividing by $1,100; (3) convert the resulting ounces of crack into kilos of marijuana, which when added to the items distributed by Braswell to J.M. and found in his possession, *see* ¶ 25, add up to 38,863 kilograms of marijuana; and (4) place Braswell in offense level 38. *See* USSG § 2D1.1(c).

(D) Braswell objects to ¶ 38, contending that the drug counts should not be grouped with the money laundering counts. The presentence officer correctly points out that the law of this Circuit requires grouping, and grouping aids Braswell.[9]

(E) Braswell objects to ¶¶ 53 through 59 on relevance grounds. The evidence in ¶ 58 is relevant. *See United States v. Watts*, 519 U.S. 148 (1997) (sentencing court may consider acquitted and uncharged conduct in fashioning appropriate sentence). The evidence is also relevant to the issue whether the three criminal history points, the maximum for Criminal History Category ("CHC") II (*see* ¶ 51), for Braswell's single felony conviction for attempted rape and kidnaping in 1987 adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit

---

[7](...continued)
to Vista Real Estate in connection with Braswell's purchase of the Dover Avenue property and did not pass back through Braswell's checking account; these amounts were not double counted); *compare also* ¶¶ 18 and 25a.

[8] A copy of the adopted portions of the PSI will be attached to this Memorandum and made part of the public record.

[9] *See United States v. Lopez*, 104 F.3d 1149 (9th Cir. 1997)

other crimes. *See* USSG § 4A1.3(e), p.s. This issue will be discussed further under guideline application below. The Court will not consider the information in ¶¶ 53, 54, 55, and 59 in determining an appropriate sentence. The Court will consider the information in ¶¶ 56 and 57 and the additional information provided regarding this charge mentioned in Judge Gonzalez' decision on Braswell's motion to suppress and the record including the circumstances of the search testified to by the witnesses at the sentencing hearing in this federal case, but only for the limited purpose of showing that Braswell was not cooperating on parole supervision, was using cocaine, and was associating with someone allegedly dealing in cocaine.[10] The Court considers the fact that Braswell's parole was revoked over this issue, requiring him to serve additional time, as significant, because it tested Braswell's capacity for deterrence. Braswell apparently immediately began selling crack cocaine when he was released in 1994, which is highly relevant to a determination of Braswell's amenability to rehabilitation and personal deterrence and serves to indicate what value if any his 1987 prosecution, conviction, and sentence had in mitigating Braswell's danger to the community and risk of recidivism. This information is significant when viewed through the prism of the evidence produced at Braswell's jury trial in this case and helps to explain the circumstances surrounding Braswell's trial in late 1994.

(F) Braswell objects to ¶¶ 63 through 65 on the ground that they do not accurately portray his family and personal history. Braswell declined to provide information to the pre-sentence officer. The

---

[10] Braswell correctly pointed out at the sentencing hearing that, if the Court was going to go beyond these conclusions and review the jury verdict acquitting him of responsibility for the cocaine found in the search of the couch he was sitting on at the time of the search, a transcript of the trial would have to be procured and reviewed. While a transcript of Braswell's 1994 trial was available and was reviewed, the earlier trial was not transcribed. The Court will therefore not assume that Braswell was guilty of that offense.

pre-sentence officer's information was gleaned from prior presentence reports. It appears accurate. None of that information will influence the Court to increase Braswell's sentence.

(G) Braswell objects that one of his civil cases mentioned in ¶ 66 is still pending. It apparently is still pending.

(H) Braswell objects to ¶ 73 contending that he left the service in 1981. The presentence officer has confirmed that Braswell was court-martialed and given a bad conduct discharge in 1984. This information will not effect the sentence.

(I) Braswell objects to ¶¶ 94 through 102 and contends that the only property he owns is being investigated for forfeiture by the United States, leaving him with no money to pay a fine. Given the sentence Braswell is likely to receive, he has no future earning capacity out of which to pay a fine beyond what he will earn in prison industries. The Court is concerned that Braswell seems to have had significant income over the past few years not adequately accounted for in the presentence report. Any fine will be payable only out of assets belonging to Braswell which he may have hidden away or recorded under other names or in the names of nominees. The Court notes that one vehicle Braswell paid for was titled to a girlfriend and from the record concludes that Braswell has made use of others to rent apartments, buy cars, etc., over the years. The Court is also concerned that Braswell has refused to provide information to his former parole officers and the present presentence officer regarding his income, assets, etc., and concludes that Braswell has not satisfied his burden of proving inability to pay a fine from sources that are not currently being considered for forfeiture. *See* USSG § 5E1.2(a) & comments. (nn. 4 and 6).

**(J)** The government objects that the figure of $70,000 chosen by the presentence officer to convert cash to ounces of crack cocaine and then to kilograms of marijuana is too low when the totality of Braswell's operation is evaluated. The Court has addressed this issue in subsection (C), *supra*.

**(K)** Braswell separately objects to inclusion of the $11,000 cash payment he made in March of 1996 as a basis for conversion into cocaine for purposes of establishing relevant conduct. Braswell notes that he briefly left the country during the summer of 1996 and feels that this trip breaks any continuity between drug dealing before and after the trip. Braswell is in error. The evidence establishes that Braswell was engaged in a continuous course of drug dealing between 1994 and 1997. Any brief trip outside the country did not sever Braswell's contact with either his sources or his market as his ability to earn the income estimated from his bank account establishes.

**4. Are any legal issues in dispute?**

Yes No _X_

There are no legal issues in dispute regarding sentencing. Braswell wishes to retry the case and particularly retry J.M., the confidential informant, but that would not be appropriate at sentencing.

**5. (a) Is there any dispute as to guideline applications (such as offense level, CHC, fine or restitution) as stated in the PSI?**

Yes _X_ No

There are three guideline issues:

**(A)** Should the Court increase Braswell's offense level to reflect a portion of the unexplained income he generated during the period charged in the indictment? *See* USSG § 2D1.1, comment. (n.12).

The Court has determined it should increase Braswell's offense level, and its analysis is set out in § 3(C) of this Memorandum, *supra*.

   **(B)** Should this Court increase Braswell's CHC from II to III to reflect conduct related to his counts of conviction that did not result in convictions but which should be considered in order to adequately reflect the seriousness of Braswell's criminal conduct and the risk that he will be a recidivist?

   Is Braswell's criminal history adequate? Had he been convicted of attempted rape and kidnaping in 1987, been let out early for good time, served an uneventful parole, and committed no other criminal acts until the offenses of conviction in this case, Braswell would have three criminal history points and be at the maximum for CHC II. Braswell did not serve an uneventful parole, however. Despite serving almost four years in prison, he learned nothing. When he was paroled in 1991 he led his parole officer to believe he intended to harm the victim of his 1987 offense. Braswell later flunked a drug test indicating he was using cocaine and a resulting search of his residence uncovered cocaine in commercial quantities and commercial packaging. He was acquitted of the resulting charges, but his parole was revoked, and he served approximately another year. He was released, but still he had learned nothing.

   Construing the evidence reasonably through the prism of the evidence presented at trial in this case, Braswell set up Nicole's Art as a front in 1993 and by July of 1994 was established in a commercial cocaine distribution operation using an apartment rented by an associate, Melodie Capener.[11] It appears

---

   [11] Braswell argues that the exclusionary rule should be considered. He recognizes that the Ninth Circuit has allowed evidence suppressed in a federal criminal case to be considered at sentencing in that same case, unless the police intentionally violated the defendant's rights in order to enhance his sentence. *See United States v. Kim*, 25 F.3d 1426 (9th Cir.), *cert. denied*, 513 U.S. 1030 (1994). It is not contended that anything done in 1994 was intended to influence a federal criminal prosecution not then contemplated. Rather, the argument is that the illegal search alerted the police to the fact that Braswell
(continued...)

Memorandum of Sentencing/Statement of Reasons
Page 13
F:\HOME\JUDGES\DOCS\SHARED\CR\A.97-0068.013

from the evidence that this operation was continuous from 1994 until Braswell's arrest on these charges

in 1997 and conservatively generated over $100,000 in cash. It does not appear that any brief trip

Braswell made to the Dominican Republic brought his drug business to an end. The substantial income

he earned precludes any finding that he started up from scratch when he returned from the Dominican

Republic.[12] Many men and some women commit crimes similar in seriousness to Braswell's 1987

offense. Most never reoffend. For them, three criminal history points accurately reflect the danger they

pose to the community and the risk of recidivism they present. To ignore the years of drug dealing for

which Braswell was responsible between July of 1994 and the Fall of 1996 would seriously under-

---

[11](...continued)

was a drug dealer and then targeted him for investigation. Braswell seems to view the administration of justice as a game in which criminals compete with the police for rewards and the judiciary acts as referee. If the criminal is able to do the crime but avoid the time because, to borrow Justice Cardozo's phrase, "the constable blundered," then the criminal "wins" and should be applauded not condemned. In fact, the exclusionary rules are a highly controversial attempt to protect the non-criminal members of society against the invasion of their privacy by allowing criminals to litigate suppression issues in the hope of deterring the police from running roughshod over the citizenry. Letting Braswell evade justice is an evil considered necessary by the Supreme Court, not a positive good. Where Braswell is not deterred by his "close shave" but emboldened to continue to break the law, the Court must consider his reaction in determining his likelihood of recidivism and the danger he poses to the public.

[12] The Court is not prepared to find that there was anything ominous in Braswell's going to the Dominican Republic. The Court is concerned, however, that he apparently sent Judge Andrews an arguably threatening letter while there but has not used this incident to enhance his sentence.

represent both his dangerousness and the likelihood of his recidivism.[13]  The Court will therefore add one criminal history point and move Braswell to CHC III.

(C)  Should this Court enhance Braswell's offense level for obstruction of justice, *see* USSG § 3C1.1, based on Braswell's perjury at trial?  If so, should it upward depart to add additional levels on the theory that Braswell has engaged in so much obstruction of justice that he is out of the heartland of this guideline and his conduct requires an upward departure to adequately address it? *See* USSG § 5K2.0 p.s. (permitting upward departure where the sentencing court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described"; internal quotation omitted).

Braswell perjured himself at trial.  He testified falsely, and his false testimony was not the product of confusion, mistake, or faulty memory.  Rather, Braswell's testimony was virtually all intentionally false and did reflect a wilful attempt to obstruct justice. *See* USSG § 3C1.1, comment. (nn.1, 3(c)).  Braswell's false testimony was material, because it was directed toward influencing or affecting the jury

---

[13] *See United States v. Beasley*, 90 F.3d 400, 403 (9th Cir.), *cert. denied*, 117 S. Ct. 533 (1996).  It is important to stress that the Court is not treating Braswell as if he were convicted of a commercial drug offense in 1994.  The jury was unable to agree, and the evidence was ultimately suppressed.  Had Braswell been convicted he would be treated as a career criminal and automatically placed in CHC VI under USSG § 4B1.1 (definition of career offender).  Braswell's attempted rape conviction would be counted as one felony and any drug distribution conviction would be the second felony. *See* USSG § 4B1.2 (definitions for § 4B1.1).  Further, Braswell's current conviction involved drugs, and he is over 18 years of age.

Memorandum of Sentencing/Statement of Reasons
Page 15
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

verdict regarding his guilt. *See* USSG § 3C1.1, comment. (n.5). Therefore Braswell should receive the two level enhancement for obstruction of justice.[14]

The more difficult question in light of the substantial sentence Braswell will already receive is whether this Court should depart upward to reflect the extent of Braswell's attempts at obstruction of justice. *See* USSG § 5K2.0, p.s. Two incidents subsequent to Braswell's trial are at issue. First, this Court has found at an evidentiary hearing that Braswell perjured himself a second time by attempting to abort his original sentencing hearing, which was held on February 12, 1998, and force substitution of counsel by falsely accusing his trial counsel, Hugh Fleischer, Esq., of using racial slurs against Braswell, calling Braswell a "stupid ass nigger." *Cf. Frazer v. United States*, 18 F.3d 778, 780 (9th Cir. 1994) (counsel allegedly called defendant "a 'stupid nigger son of a bitch and said he hopes I get life'").

---

[14] Braswell relied upon *United States v. Shonubi*, 802 F. Supp. 859 (E.D.N.Y. 1992), *reversed*, 998 F.2d 84 (2nd Cir. 1993), *appeal after remand*, 103 F.3d 1085 (1997), for the proposition that willful perjury should not automatically result in a two-level enhancement where the resulting sentence would not serve the purposes outlined in 18 U.S.C. §§ 3551, 3553. *Shonubi* was reversed on this ground in light of the Supreme Court's decision in *United States v. Dunnigan*, 507 U.S. 87 (1993). Now, it is clear that where perjury, as opposed to merely inaccurate testimony, is proved, enhancement is mandatory. *See United States v. Ancheta*, 38 F.3d 1114, 1117 (9th Cir. 1994).

*Shonubi* also relied on USSG § 3C1.1 comment. (n.1.), which at that time required the evidence to be construed most favorably to the defendant in evaluating whether he had perjured himself at trial, which led some courts to apply a standard other than the preponderance of the evidence to this issue. *See, e.g., United States v. Montague*, 40 F.3d 1251, 1254 (D.C. Cir. 1994) (applying clear and convincing standard). The phrase in application note 1 that "such testimony or statements [of a defendant testifying on his own behalf at his trial] should be evaluated in a light most favorable to the defendant" was deleted and the reference to "confusion, mistake, or faulty memory" was substituted by Amendment 566 effective November 1, 1997. The purpose of the amendment was to remove any basis for inferring that a burden of proof higher than preponderance of the evidence must be met before enhancing a defendant's sentence because of his perjury at trial. *See* USSG App. C, Amend. 566 at 414-15 (Nov. 1997) (explaining that amendment "addresses a circuit court conflict" and "clarifies" intended meaning of section that not all inaccurate testimony is obstruction of justice); USSG § 1B1.11, p.s. (establishing that the "court shall use the Guidelines Manual in effect on the date that the defendant is sentenced").

After hearing the testimony of Fleischer and Braswell, the Court concluded that Braswell was perjuring himself.

The second issue involves Braswell's filing a lawsuit naming his most recent trial counsel as a civil rights defendant. This action followed this Court's refusal to substitute counsel for Mr. Cummings and appoint a fifth attorney to represent Braswell. In light of Braswell's frequent conflicts with appointed counsel, this Court was concerned that the lawsuit was a sham and merely a device to further delay sentencing. *See* Docket No. 134 (Order to Show Cause). After hearing from the parties, the Court concluded that Braswell did bring the lawsuit to obstruct justice by delaying and otherwise complicating sentencing. Braswell argued that his lawsuit was not intended to disrupt but was his good faith effort to force consideration of his issues, namely that J.M. was barred by state law limiting the extent to which a person on probation or parole could be used as a confidential informant, and secondly that the full extent of her sordid history should have been but was not brought to the attention of the state magistrate who issued a "*Glass* warrant"[15] authorizing the police to put a wire on J.M. and use her to make purchases of crack cocaine from Braswell. In Braswell's view, deficiencies in the warrant coupled with J.M.'s status as a probationer/parolee required this Court to find that all of the evidence gathered against him through the controlled buys (Counts I through IV) using the informant was gained in violation of his Fourth Amendment rights requiring dismissal of the charges. This Court declined to rule in Braswell's favor, leading him to conclude that if he was going to obtain justice it would have to be in a separate lawsuit before another judge. Braswell noted that this Court felt an action against his current

---

[15] *See State v. Glass*, 583 P.2d 872 (1978) (holding Alaska constitution prohibits electronic monitoring of conversation upon consent of police informant without search warrant based on probable cause), *affirmed on rehearing sub nom. Coffey v. State*, 596 P.2d 10 (1979).

Memorandum of Sentencing/Statement of Reasons
Page 17
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

and most recent attorney was not ripe until Braswell's conviction was set aside. But he argued that the Court mistakenly viewed his claim as brought under 42 U.S.C. § 1983 when in fact it was brought under 42 U.S.C. §§ 1981, 1985 and 1986. *See Heck v. Humphrey*, 512 U.S. 477 (1994).

Resolution of this matter requires consideration of two sub-issues: (1) is Braswell's complaint against Cummings and by extension Fleischer frivolous, and (2) is it brought with the intent to obstruct justice by forcing substitution of counsel and delay in sentencing? It appears clear that Braswell's lawsuit is frivolous as to Mssrs. Cummings and Fleischer, because Braswell cannot complain of ineffective assistance of counsel or the related state tort of malpractice under these federal civil rights statutes unless he can show that his criminal prosecution was resolved in his favor. *See Heck*, 512 U.S. at 486-87; *Shaw v. State*, 816 P.2d 1358, 1360 (Alaska 1991), *appeal after remand*, 861 P.2d 566 (Alaska 1993) (must show actual innocence). While it is true that Braswell can bring an action akin to abuse of process under the Civil Rights Act of 1871 without violating *Heck*,[16] he cannot sue Cummings or Fleischer for abuse of process, because they did not commence the action against him in federal court. They were appointed to represent him after the action was commenced by others. They cannot be sued under § 1985, because they did not conspire to prevent Braswell from bringing his civil rights lawsuit. The federal criminal action was filed before they were appointed and is apparently still pending. As private attorneys, their sole duty to Braswell was to defend him in this action. Their efforts cannot be complained about unless Braswell prevails on appeal. Braswell cannot sue Cummings and Fleischer under § 1986 on the theory that they should have brought motions, because the motions--questioning J.M.'s right to be a confidential informant while she was on state probation or parole and questioning

---

[16] *See Heck*, 512 U.S. at 486 n.5.

Memorandum of Sentencing/Statement of Reasons
Page 18
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

AO 72A
(Rev.8/82)

the circumstances leading to the issuance of a *Glass* warrant—were brought and denied. *See* Docket No. 74 (order of October 20, 1997).[17] A prerequisite to liability under § 1986 is the power to prevent the § 1985 conspiracy. Braswell contends that Cummings and Fleischer should have brought motions complaining about J.M., but this Court had already made it clear that no such motions would be granted. The only remedy was an appeal. Braswell has not contended that any attorney refused to bring an appeal from a final judgment. Such a claim would be premature since no final judgment will exist until sentencing is completed. Therefore, Braswell has no claim against Cummings or Fleischer under § 1986. Finally, Braswell has not stated a colorable claim against either Cummings or Fleischer under § 1981, because that section refers only to interference with contract rights. The right not to be maliciously prosecuted is not a contract right. The right to bring motions in a criminal proceeding is not a contract right. Therefore, § 1981 is irrelevant to any relationship between Braswell and Cummings and Fleischer.

The fact that Braswell has brought a meritless complaint against two of his attorneys is insufficient to find obstruction of justice unless that was Braswell's goal. He denies that it was. The Court rejects his denial. First, Braswell has perjured himself twice in these proceedings, first at trial and second in connection with his efforts to fire Mr. Fleischer. Thus, his testimony and statements may be distrusted in other particulars. Second, Braswell followed the same strategy during his recent state court prosecution. When Judge Andrews declined to grant Braswell substitution of counsel, Braswell filed

---

[17]  The Court's precise holding was that substitution of counsel at Braswell's request did not reopen motion practice under FED.R.CRIM.P. 12. To have motions filed by substitute counsel, counsel and by extension Braswell, would have to show that failure to bring the motions at an earlier time was the result of ineffective assistance of counsel. The Court then considered the motions and determined that it was not ineffective assistance of counsel to fail to bring the motions, because they lacked merit. *See* Docket No. 74 (order). This decision is and binding on all parties and their attorneys. If Braswell is dissatisfied with this ruling, then his only remedy is an appeal.

a lawsuit against her and his then-attorney Rex Lamont Butler. Later, Braswell filed a second lawsuit against a substitute counsel. In the state proceedings, Braswell had his way in the short run. Judge Andrews declined to proceed further until the action against her was resolved, and Mr. Butler was permitted to withdraw because Braswell had sued him. Eventually, Braswell had three court appointed attorneys in the state case. It is instructive that Braswell's action against Judge Andrews and Mr. Butler were dismissed. *See* ¶¶ 66 and 67. From this bit of history two things are clear: before he sued Cummings, Braswell knew that he had no claim that would survive dismissal and, therefore, he must have sued in bad faith. When we remember that Braswell's action against Cummings followed closely on this Court's denial of Cummings' motion to withdraw, which was brought at Braswell's request, the only reasonable inference is that Braswell brought the civil action in bad faith to disrupt these proceedings and delay sentencing. Apparently, Braswell sought to duplicate in this proceeding the delays he forced in his state court proceedings.

The Court initially considered an upward departure based on Braswell's multiple obstructions of justice. *See* Docket No. 134 (Order to Show Cause) at 14. The requirements of *Koon v. United States*, 518 U.S. 81, 96 (1996), are satisfied, because Braswell's continuous efforts at perjury and disruption clearly take his case out of the heartland where a defendant gives false testimony on a material matter at trial but engages in no other obstructive behavior. *See also United States v. Sablan*, 114 F.3d 913, 916 (9th Cir. 1997) (*en banc*), *cert. denied*, 118 S. Ct. 851 (1998). This case is unusual because this Court has never encountered such a degree of obstruction in over twenty five years as a state and federal judge. The Court initially considered a six-level upward departure, including the two-level enhancement authorized by USSG § 3C1.1, to reflect that Braswell had engaged in three separate and

distinct obstructions of justice.[18] The Court noted that a six-level increase for multiple obstructions of

justice would be one-half the offense level of 12 for obstruction of justice, *see* USSG § 2J1.2, which

could be raised to 15 if the obstruction caused "the unnecessary expenditure of substantial governmental

or court resources." USSG § 2J1.2(b)(2) & comment. (n.1). Braswell correctly points out that if he

were separately convicted of two counts of obstruction of justice his maximum sentence would be 15

to 21 months on each count (CHC III and offense level 12) or 24 to 30 months (CHC III and offense

level of 15). If the offenses were not grouped, his maximum exposure for consecutive sentences would

be 30 + 30 = 60 months. In contrast, after offense level 34, each increase in offense level at CHC III

increases the maximum sentence within the applicable range by more than 24 months. Braswell suggests

that a departure equal to four offense levels is inconsistent with Circuit authority. *See United States v.*

*Nagra*, No. 97-30105, 1998 WL 293756 (9th Cir. June 8, 1998); *United States v. Matthews*, 120 F.3d

185, 188 (9th Cir. 1997). This Court disagrees. Tying enhancements for obstruction of justice to the

actual sentences permitted for obstruction of justice overlooks the rationale behind USSG § 3C1.2,

which is to punish a defendant more severely when the crime he is attempting to lie himself out of is

more serious. *See United States v. Rubio-Topete*, 999 F.2d 1334, 1340 (9th Cir. 1993). Further, in

determining the degree of departure the Court must consider the sentencing goals set out in 18 U.S.C.

§§ 3551 and 3553. The extent of a defendant's obstruction is relevant to his or her capacity for

---

[18] The Court considered a total upward departure of six levels consisting of: two levels under
USSG § 3C1.1 for Braswell's perjury at trial and under USSG § 5K2.0, p.s. two levels respectively for
his perjury in connection with Mr. Fleischer's representation and for bringing a frivolous lawsuit. *See*
Docket No. 134 (Order to Show Cause) at 12-15.

rehabilitation and deterrence, and, if it militates against reliance on such sentencing goals, serves to promote incapacitation as a primary sentencing goal.

On the other hand, Braswell's offense level without a USSG § 5K2.0, p.s. upward departure is 40 and his CHC is III, which permits a sentence of 360 months to life imprisonment. It seems that a sentence of 400 months should be sufficient to satisfy the criteria of 18 U.S.C. §§ 3551 and 3553. If the Court were motivated to reduce Braswell's offense level back to 34 by declining to convert cash into crack cocaine, then the Court would be concerned that the resulting sentence range at offense level 36 (34 + 2 for obstruction of justice) would be insufficient to incapacitate Braswell, deter others, and protect the community.[19] In such a case the Court would, in the exercise of its discretion, depart upward to permit a sentence nearer the 400 months imposed here. Under the circumstances, however, a departure is not necessary. Therefore, in the exercise of its discretion, the Court declines to depart upward to reflect Braswell's pattern of obstruction of justice beyond the two-level enhancement provided for in USSG § 3C1.1. This decision does not affect the prior decision to depart upward in CHC to reflect the danger Braswell poses to the community and the likelihood of his recidivism.

5.    (b)    **Tentative findings as to applicable guidelines after departures are:**

- ▸    Total Offense Level:  40
- ▸    Criminal History Category:  III
- ▸    360 months to life imprisonment
- ▸    3 to 5 years supervised release
- ▸    $25,000 to $4,000,000 fine

---

[19] The sentencing range at CHC III and offense level 36 is 235 to 293 months. *See* USSG Ch. 5, Pt. A (sentencing table). Thus, the maximum sentence would be a little less than 24 and one-half years. With credit for good time, a person serving a 24-year sentence could be out in approximately twenty years.

Memorandum of Sentencing/Statement of Reasons
Page 22
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

▸    Plus cost of imprisonment/supervision:[20]

| PRISON | HALF-WAY HOUSE | SUPERVISION |
|---|---|---|
| $1,910.17/month | $1,186.25/month | $217.18/month |

▸    Restitution:  N/A

6.    (a)    Are there any legal objections to the tentative findings?

Yes <u>X</u>                No

6.    (b)    If yes, describe objections and how they were addressed:

The objections are all addressed *supra*.

7.    Defendant was given the opportunity to speak on his own behalf.

8.    The sentence was imposed as follows:

- ▸    400 months imprisonment
- ▸    Months/intermittent community confinement:  N/A
- ▸    Months probation:  N/A
- ▸    5 years supervised release
- ▸    $98,677 fine (including costs of imprisonment/supervision)
- ▸    Restitution:  N/A
- ▸    Other provisions of sentence (community service, forfeiture, etc.) and/or special terms of probation or supervised release:  N/A

**Check appropriate space:**

9.    (a)    [  ]  The sentence is within the guideline range and that range does not exceed 24 months, and the Court finds no reason to depart from the sentence called for by application of the guidelines.

[ X ]  The sentence is within the guideline range as adjusted and that range exceeds 24 months.

---

[20] *See* ¶ 102.

Memorandum of Sentencing/Statement of Reasons
Page 23
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

9.    (b)    [ X ] Sentence departs from the guideline range as a result of:

[ ] (i) substantial cooperation upon motion of the government.

[ ] (ii) a finding that the following (aggravating or mitigating) circumstances exists that is of a kind or degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described by the guidelines.

[ X ] (iii) a finding that the defendant's CHC does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes. USSG § 4A1.3(e) (prior similar adult criminal conduct not resulting in a criminal conviction).

9.    (c)    Is restitution applicable in this case?        Yes        No X

9.    (d)    Is a fine applicable in this case?            Yes X        No

9.    (e)    Is the fine within the guidelines imposed?      Yes X        No

10.    Was a plea agreement submitted in this case?        Yes        No X

11.    Suggestion for Guideline revisions resulting from this case are submitted by an attachment to this report.                    Yes        No X

12.    The PSI is to be maintained by the United States Probation Office under seal. Those sections adopted and incorporated as part of this statement of reasons will be part of the public record.

13.    The Clerk of Court shall prepare the judgment.

14.    The Clerk of Court will provide this Memorandum of Sentencing Hearing and Report of Statement of Reasons to the United States Probation Department for forwarding to the Sentencing Commission and to the Bureau of Prisons.

## COURT'S STATEMENT OF REASONS FOR IMPOSING SENTENCE

Cyrus Braswell presents a very difficult sentencing decision. He was born August 27, 1961, and is currently 36 years old. According to a life expectancy table for African-American (Black) males consulted by the Court, Braswell has a live expectancy of approximately 34 years or 408 months.[21] The question therefore is how large a percentage of that 408 months Braswell should remain in prison to satisfy the standards set out in 18 U.S.C. §§ 3551 and 3553. In 18 U.S.C. § 3553(a), Congress cautions trial judges to impose the minimum sentence which will satisfy the criteria in § 3553(a)(2), namely (A) retribution--the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes by the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

This Court brings almost twenty-eight years of judging to this decision. I spent ten years on the state superior court as a trial judge of general jurisdiction responsible for felony sentencing. I spent ten

---

[21] The table consulted by the Court can be reached via the "Life Expectancy by Age, Race, and Sex, 1995 and 1996" link at http://www.cdc.gov/nchswww/fastats/lifeexpec.htm. The table reflects a Black male 35 years of age in 1995 could expect to live approximately 34.5 more years, while a Black male age 40 could expect 30.5 more years of life. The 1996 figures were only preliminary and therefore were not used.

Memorandum of Sentencing/Statement of Reasons
Page 25
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

years on the state's court of intermediate appeals, a court whose jurisdiction was exclusively criminal and who had the responsibility to hear sentence appeals which at the time were a matter of right in Alaska. Finally, for the past almost eight years I have been a federal trial judge responsible for imposing sentences under the Guidelines. During those years, I have been exposed to criminal defendants of all races, religions, ethnic backgrounds, and national origins. I have been exposed to numerous defendants who were suffering from virtually every kind of mental disease or defect, including many psychotics and many with an anti-social personality defect. I fully believe that most sentences should emphasize deterrence of the individual and his or her reformation or rehabilitation. Maximum or near maximum sentences should be reserved for those who show little likelihood of deterrence or little capacity for rehabilitation: the men and women for whom incapacitation is the only realistic sentencing goal. For such people, community protection must be the primary goal of sentencing. Such men and women are extremely rare.

Many young men have appeared before me with an attitude similar to Braswell's. They believe that they are victims of parents, schools, society, the government, or whatever racial or ethnic background they represent. They are frequently defiant and often in denial. They almost always excuse their conduct by blaming their victim(s). But despite a bad attitude, they almost never reoffend. Experience teaches that the majority of young men convicted of felonies find the whole process so unpleasant that they are not brought back to court. A significant minority do reoffend, but even they tend to slow down as criminals as they age, and by age 25 have withdrawn from active involvement in

criminal activity. A small minority continue to reoffend after the age of 25 and they are the ones for whom significant sentences should be reserved.[22]

Braswell committed his first adult crimes shortly after he turned twenty. He was convicted of weapons and drug offenses. He seems to have been almost continuously in trouble after that. *See* ¶¶ 47-50, 53, 54. While the events described in the latter two paragraphs should not be considered as convictions, and the events in the earlier paragraphs considered only as background, it is interesting that Braswell's 1987 conviction for attempted rape, assault, and kidnaping was not completely out of character. Braswell was 25 at the time. More importantly, Braswell apparently learned nothing from his conviction and resulting sentence. His parole officers testified eloquently to Braswell's attitude when released, including a threat against his victim. It is rare to encounter someone who is such a complete failure on parole at the relatively mature age of 25 in the absence of drug or alcohol addiction or serious mental injury. Braswell has been in and out of prison for years and before many courts, and no one has suggested that he is drug or alcohol dependant or mentally ill.[23] Most disturbing, while still on parole

---

[22] It is important to distinguish between two classes of mature offenders. The first are men and women who have lived blameless lives and then offend for the first time during middle age. Such people have not had their capacity for deterrence and rehabilitation tested. In contrast is the second class, which is comprised of people like Braswell who offend at a relatively young age, here 20, and continue to regularly offend thereafter. Braswell has been in and out of prison for almost 16 years. It appears he almost immediately became involved in the distribution of crack cocaine when he was finally released on parole from his 1987 conviction and that he continued in that pursuit until arrested on the current charges. The state probation officers who supervised Braswell while he was on parole testified that he was belligerent, antagonistic, and deceitful during the entire time he was on parole.

[23] Braswell has been involved in three prior state court proceedings and in this proceeding. His sanity or competence has never been questioned. He has been represented by numerous lawyers and supervised by two experienced parole officers without doubts about his competence being expressed. It is true that one parole officer described Braswell in terms that would suggest anti-social personality disorder, *see* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
(continued...)

supervision, during a time when most convicts are most careful about their behavior, Braswell began to deal seriously in crack cocaine using Nicole's Art, which he established in 1993, and later Art World as fronts. It is clear that Braswell was engaged in the commercial distribution of crack cocaine at least since July of 1994 when he used a residence supplied to him by a girlfriend, Melodie Capener, and later from his own residence.

Braswell's repeated perjury and obstruction of justice and his total denial of responsibility, as expressed in his allocution, establishes to the extent that evidence can that he is not capable of reformation, rehabilitation, or individual deterrence. The only appropriate sentencing goal is to incapacitate him until he is no longer capable of harming the public. This Court has seriously considered a life sentence without possibility of parole for Braswell. Given his age and his total failure to learn from past prison sentences, parole supervision, or "close shaves" in drug prosecutions, Braswell will most likely reoffend immediately after he is released. If Braswell was going to simply outgrow crime it would appear that he would have done so long before now. Nevertheless, a 400-month sentence followed by 60 months of supervised release during which, in contrast to his experience in state court, he will be subject to warrantless searches for drugs, weapons, and evidence of violation of supervised release based

---

[23](...continued)
DISORDERS § 301.7 (4th ed. 1994), which might mask more serious mental disorders, but no suggestion of such disorder was made until Mr. Cummings indicated during sentencing that Braswell might not be competent to represent himself because his strategy was self-defeating. Bad strategy does not equal incompetence. *Godinez v. Moran*, 509 U.S. 389, 396-403 (1993), *on remand to*, 40 F.3d 1567 (9th Cir.), *amended and superseded on denial of rehearing and rehearing en banc*, 57 F.3d 690 (1994), *cert. denied sub nom. Moran v. McDaniel*, 516 U.S. 976 (1995); *United States v. Arlt*, 41 F.3d 516, 518 (9th Cir. 1994). Braswell was denied the right to represent himself at sentencing because his request was untimely, not because he was incompetent. This Court does not have a good faith doubt regarding Braswell's competence. *See Godinez*, 57 F.3d at 695.

Memorandum of Sentencing/Statement of Reasons
Page 28
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

on reasonable suspicion, will assure the public that Braswell will be subject to supervision for almost the rest of his life, but will at the same time give him some hope and incentive to cooperate with correctional officials in order to earn good time credits. *See* 18 U.S.C. § 3624.[24]

DATED at Anchorage, Alaska, this __26__ day of June, 1998.

JAMES K. SINGLETON, JR.
United States District Court Judge

---

[24] Experience teaches that Braswell tends to operate through fronts and nominees, and tends to hide his employment and residence while on parole. Therefore, in addition to making Braswell's residence and place of employment subject to warrantless searches based upon reasonable suspicion, the Court would have considered extending the warrantless search provision to any place where the probation officer has reason to believe Braswell is engaging in illegal activity. However, so much time will elapse before he is on supervised release that the requirements for effective supervision should be established at that time.

Memorandum of Sentencing/Statement of Reasons
Page 29
F:\HOME\JUDGES\DOCS\SHARED\CR\A97-0068.013

25a.    U.S.S.G. § 2D1.1, comment. (n.12) states that if there is no drug seizure or the amount seized does not reflect the scale of the offense, the Court shall approximate the quantity of the controlled substance.    According to the investigating agents and the evidence introduced at trial, Braswell's legitimate income from his "art" business was meager at

ATTACHMENT A
PAGE 1 OF 2

PRESENTENCE REPORT - BRASWELL, Cyrus D.A.

best, and his primary source of income was from the distribution of cocaine. Investigating agents were able to determine that in 1996 and 1997, Braswell, with checks written on the Nicole's Art account, purchased at least $60,000 worth of assets, and from September 1996 through May 1997 paid approximately $10,800 in rents for the Nicole's Art business space. A preponderance of evidence indicates that those assets and the business rents were paid with cash monies Braswell earned from the distribution of cocaine. Therefore, the amount of cocaine distributed by Braswell during the controlled buys and seized at his house does not reflect the scale of the offense and the assets and rent monies should be converted to the estimated amount of cocaine which Braswell distributed to purchase those assets and pay those rents. Braswell was typically a crack cocaine dealer, and according to the CI, he sold ounces of crack cocaine for $1,100 and one-half ounces of crack cocaine for $600. The CI's statements are supported by the fact that on May 16, 1997, Braswell sold the CI approximately one-half ounce of crack cocaine for $600; on May 20, 1997, Braswell again sold the CI approximately one-half ounce of crack cocaine for $600; and on May 28, 1997, Braswell sold the CI approximately one ounce of crack cocaine for $1,100. Braswell paid at least a total of $10,000 in rent and purchased the following assets.

| | |
|---|---:|
| 1994 Chevrolet pickup truck  (Paragraph 14) | $ 11,544.00 |
| Mobile Home (Paragraph 14a) | 9,000.00 |
| Business assets (Paragraph 15) | 12,500.00 |
| Residence at 1714 Thunderbird Place (Paragraph 18) | 17,124.00 |
| Residence at 7600 Dover (Paragraph 18) | 10,000.00 |
| TOTAL: | $ 60,168.00 |

25b.  The assets and rents total approximately $70,000, which at $1,100 per ounce would convert to approximately 63 ounces or 1,786 grams of crack cocaine, or 35,720 kilograms of marijuana. Therefore, the total quantity of drugs for which Braswell is responsible totals 38,863 kilograms of marijuana (3,143 kilograms of marijuana plus 35,720 kilograms of marijuana).

ATTACHMENT A
PAGE 2 OF 2